# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

|  |  |
|---|---|
| BAXTER BRUCE,<br><br>*Plaintiff,*<br><br><br>vs.<br><br>UNIFIED SCHOOL DISTRICT 259,<br><br>*Defendant.* | Case No. 16-CV-1121-EFM |

## MEMORANDUM AND ORDER

Plaintiff Baxter Bruce filed this action against Defendant Unified School District 259 ("USD 259" or "the District"), asserting claims of sex and race discrimination under Title VII, associational discrimination in violation of the Americans With Disabilities Act ("ADA"), and retaliation.  USD 259 filed a motion for summary judgment, arguing that Bruce has failed to establish a prima facie case of employment discrimination or retaliation; and, even if he has, USD 259 is entitled to judgment as a matter of law because it had legitimate non-discriminatory and non-retaliatory reasons for every action it has taken in relation to Bruce.  For the following reasons, the Court grants USD 259's motion for summary judgment (Doc. 24).

## I.    Factual and Procedural Background[1]

USD 259 is a school district in Wichita, Kansas, and it operates the Wichita Public Schools. When he filed his complaint on May 2, 2016, Bruce was a 52-year-old African American male. He lives in Wichita and has been employed by USD 259 since 1993. He is currently a supervisor in the District's Safety Services Department.

## A.    General Background

Bruce was first promoted to a managerial position in 2002. Currently, he is employed as the District's Security Communications Supervisor, which is also referred to as the Supervisor of Dispatch or simply Supervisor Dispatch.[2] He is the only USD 259 employee who holds his title(s) and performs his essential job functions.

Approximately 40 employees, including Bruce, work within the Safety Services Department. Bruce, as well as the other Department supervisors report directly to the Department's Executive Director. From 2008 through June 2013, the Department's Executive Director was Debbie McKenna. USD 259 hired the current Executive Director, Terri Moses, shortly after McKenna left.

During the period at issue, from early 2013 through August of 2016, there were four Department supervisors that reported to Executive Director Moses: Bruce, Stephanie Quick, Chuck Newman, and Michele Zahner.[3] Zahner left the Department in August of 2016. It appears

---

[1] Except where noted, the Court has set forth the uncontroverted facts in the light most favorable to Plaintiffs.

[2] As explained below, there was one instance where Bruce's position was referred to as "Lead Dispatch" in a USD 259 directory, and one instance where some of Bruce's co-workers referred to him as the "Lead Dispatcher." However, the directory was corrected and this title was never officially adopted.

[3] Moses, Zahner, and Quick are white females. Newman is a white male.

that her position has not been filled as the three remaining supervisors are the only individuals currently reporting directly to the Executive Director.

Generally speaking, Quick is responsible for providing, developing, or scheduling training for Safety Services personnel, as well as school administrators and other school personnel. Newman is primarily responsible for the supervision of approximately 26 school-based security officers and an additional security officer assigned to the Administrative Center. And, during her tenure, Zahner worked primarily as the liaison between USD 259 and seven School Resource Officers—commissioned police officers employed by the Wichita Police Department and assigned to each of the USD 259 high schools.

Bruce is primarily responsible for supervising the six dispatchers working in the Safety Services Department. These dispatchers, as well as Bruce, take calls from parents, teachers, building administrators, the police, and members of the public regarding a variety of school safety concerns. Additionally, they also dispatch USD 259 security officers to various school facilities to investigate matters that have been reported. Bruce and his staff work in a subdivision of the Safety Services Department known as "dispatch" or the "dispatch office."

## B.    Bruce's allegations of discrimination and retaliation

The parties agree that the job descriptions and organizational hierarchy described above accurately reflect the Safety Services Department when Bruce was initially promoted, and as the Department operates currently. However, in November 2012, Bruce requested leave under the FMLA to aid his disabled mother, who required 24-hour care. USD 259 granted Bruce's request for FMLA leave.[4] After he submitted his request, however, Bruce claims that USD 259 retaliated

---

[4] Bruce's FMLA leave request has been re-authorized in each 12-month period since. Bruce has used his FMLA eligibility to work a reduced schedule on a recurring basis to care for his mother. At no point since his request

against him by assigning him to second shift, and later changing his job title, responsibilities, and position in the hierarchy for a period beginning in 2013 until Zahner left the department in August of 2016.

### 1.    Shift Change

Bruce first claims that the District retaliated against him for requesting FMLA leave by changing him from his normal first shift to second shift.  In March or early April 2013, McKenna met with USD 259's Chief Human Resources Officer, Shannon Krysl, and then met separately with Bruce; the purpose of these meetings was to discuss the impact that the sudden loss of a dispatcher (other than Bruce) who worked first shift would have on the Safety Services Department.[5]  McKenna determined that it would be most effective for the Department to move Bruce to second shift temporarily until a new dispatcher could be hired because she anticipated Bruce would be gone for portions of many first shifts.  Bruce was then moved to second shift, and Earl Wilson, a white male, took over Bruce's first shift.  There is a genuine dispute whether the Executive Director arranged for other staff to back up Wilson for breaks and absences, and that back-up structure was something that Bruce never received while he worked either the first or second shift.

---

was granted has he been precluded or prevented from taking FMLA leave at any time he has requested leave to care for his mother.

[5] In response to the District's Statement of Fact 30, Bruce attempts to controvert this fact.  He "contends that no such meeting took place between he, McKenna, and Chief Human Resources Officer, Shannon Krysl."  Doc. 28, p. 7.  He then cites his affidavit, which provides "I do not recall meeting with Debbie McKenna and Chief Human Resources Officer Shannon Krysl in March or early April of *2015* regarding the impact of *my leave* on the Safety Services Department."  Doc. 28-1, p. 3 (emphasis added).  This does not controvert the fact that a meeting took place in *2013* regarding the impact of a *different* dispatcher's unexpected leave and subsequent retirement.  Moreover, Statement of Fact 30 asserts that McKenna met with Bruce *separately*, after her meeting with Krysl.

Upon learning of his temporary move to second shift, Bruce made a complaint with the Department of Labor.  Bruce spent no more than five days on second shift before USD 259 returned him to first shift.  And he performed the same tasks and had the same job responsibilities on second shift as he did on first shift.

    2.    *Organizational Hierarchy*

Bruce also claims that his position in the organizational hierarchy changed in 2013 as retaliation for requesting FMLA leave.  According to Bruce, Zahner "took control" of the dispatch office and he was functionally subordinated to her.

In 2011, Executive Director McKenna eliminated the former department titles and granted all four department heads the title of "Department Supervisor."  However, at some point in 2013, Bruce started being referred to as "Security Communications Supervisor" or "Supervisor of Dispatch."  On one Safety Services Department Organizational Chart, Bruce's position is titled "Supervisor Dispatch," while the other three supervisor positions are titled "Safety Services Supervisor."

Bruce was listed as "Lead Dispatcher" in the initial electronic version of the "Support Centers Directory" for the 2013-14 year.  Moses identified the error, and the directory was corrected so that Bruce was listed as a "Supervisor of Dispatch."[6]  However, Moses was not—nor was anyone else in the Safety Services Department—responsible for drafting or editing the Support Centers Directory, which is made by the District's Communications Department.  Moreover, Bruce

---

[6] It is unclear when any of these events happened.  However, in the complaint filed with the Kansas Human Rights Commission on November 8, 2013, Bruce claimed: "[I]n July 2013, I was 'demoted' from the position of Safety Service Supervisor to Lead Dispatcher . . . .  I was informed by my Supervisor that nothing would change and my duties would remain the same even though I was 'demoted.' "  Doc. 25-16, p. 2.

testified that he was not aware of any instances in which he was referred to as "Lead Dispatcher" by a supervisor or in any other USD 259 records or directories.[7]

Bruce testified that two security officers asked him if he was "Lead Dispatcher" at work, although it is not clear when this happened. According to Bruce, one security officer asked him "[w]hat's this lead dispatch thing?" and the other asked him "a lead dispatcher? Ooh, Michele [Zahner] got your job." Bruce was asked how he responded, and he testified: "I said, 'it's just a document.' " When asked if he knew that was true, he answered: "Well, I had to do my supervisor role."[8]

In the summer of 2013, Moses presented Bruce with a draft Safety Services Department Organizational Chart. At the time, Moses was in the process of evaluating the status of the Safety Services Department and determining how it could potentially run more effectively. During her meeting with Bruce to discuss the draft organizational chart, she informed him that she was contemplating incorporating Zahner into dispatch in some capacity. According to Bruce, the chart showed Bruce reporting only to Zahner. Bruce testified that Moses then told him "I am placing you under Michele [Zahner]." Bruce immediately informed her that he did not like the idea of reporting to Zahner. As a result, the draft organizational chart was not adopted.

With the exception of the draft organizational chart, Bruce's job description has never required him to report to Zahner or another Safety Services supervisor. Bruce testified that he reports to Executive Director Moses and that she is his boss. Although Bruce testified that Moses

---

[7] Bruce also points out that he is listed as "Supervisor Dispatch," and not "Department Supervisor" on USD 259's website. Additionally, he was left off of the contact information sheet for the Safety Services Department that was provided at a meeting for principals and police on June 24, 2014, and he was not invited to that meeting.

[8] Doc. 28-1, pp. 119–20.

told him to speak with Zahner before speaking with Moses, he noted that he could always talk to her in person or on the phone, and he could not point to a single instance in which he had to go through Zahner first. Additionally, Zahner never ordered Bruce to do anything—he has not received any orders from anyone other than the Executive Director.

Beginning approximately in the summer of 2013, Bruce was required by Moses to report his FMLA absences to Jan Stowell, Jeannette Parker, Newman, Quick, and Zahner.[9] USD 259 explains that dispatch must be covered at all times, so Bruce, as Supervisor of Dispatch, must notify someone when he is absent for any reason—FMLA or otherwise. This is the only evidence that Bruce was required to report anything to someone other than the Executive Director.

3.   *Bruce's Job Description and Responsibilities*

In addition to changes in the Department organizational structure, Bruce also claims that Zahner took control of his responsibilities after he requested FMLA leave. The Security Communications Supervisor/Supervisor of Dispatch is responsible for supervising the six dispatchers working in the Safety Services Department. USD 259's job description for the Security Communications Supervisor provides that the position "[s]upervises dispatch personnel and all functions of Security Communications." The job description then provides:

**Essential Performance Responsibilities:**
- Schedules assignments for all dispatchers
- Monitors the activities of all Security communications personnel on day, night, weekend, and holiday assignments
- Monitors district radio traffic and Security Communications telephone calls
- Conducts and supervises routine and emergency electronic building checks
- Monitors alarms and troubleshoots for all USD 259 facilities, notifies appropriate personnel
- Monitors and/or prepares and delivers a daily report of noteworthy Security Communications issues

---

[9] It is not clear who Stowell and Parker are.

- Facilitates training for Security Communications personnel
- Assumes primary responsibility for personnel assignments in emergency situations and/or approved leave requests
- Assists with routine and emergency situations pertaining to USD 259 properties, personnel, and students as requested to do so
- Develops policies and procedures regarding area of responsibility
- Interviews prospective employees
- Monitors and reports activities of Kansas One-Call
- Manages Security Communications expenses and makes recommendations regarding the Safety Services Budget
- Provides supervisory duties (i.e. mentoring, coaching, evaluation)
- Participates as a member of the District Crisis Team

The document also states: "Additional Duties: Performs other duties as assigned."

Although not mentioned in the official job description, all of the supervisors employed in the Safety Services Department, including Executive Director Moses, are required to "work ballgames," i.e., attend and supervise extracurricular events such as football and basketball games from time-to-time.

Executive Director McKenna stated in an affidavit that one of Bruce's "primary responsibilities" in his supervisory position is to ensure that the dispatch desk is staffed at all times.[10]  In order to do so, Bruce has the authority, without seeking the approval of the Executive Director, to schedule dispatchers to work overtime if the situation required it.  Besides two of Bruce's responsibilities—supervising the dispatch personnel and ensuring the dispatch desk is staffed—the evidence does not suggest that any of Bruce's other responsibilities are more important or essential than the rest.

---

[10] Doc. 32-4, p. 1.

>    *4.    Bruce's claims that his responsibilities were reassigned*

Bruce alleges that many of his responsibilities were taken away from him or reassigned to Zahner between early-2013 and August of 2016.  The Court describes each of these allegations in turn.

>        a.    Zahner assisted Bruce with dispatcher evaluations in 2013-14

As mentioned in his job description, Bruce is responsible for conducting evaluations of the dispatchers working under his supervision.  During the 2013-14 evaluation period, Zahner assisted Bruce with the dispatcher evaluations by typing up the evaluations for Bruce, because Zahner is a better typist than Bruce.[11]  Bruce signed each evaluation, and testified that each evaluation was "accurate," and that he did not have any objections to any of the evaluations.  Bruce signed the evaluations on the line indicating "Evaluator's Signature," and Zahner signed below Bruce's signature.  And in May of 2017, Bruce spoke to Zahner by phone and told her that he appreciated her help with the evaluations.

>        b.    Bruce was removed from the Incident Command Backup rotation

The Safety Services Department has an Incident Command Backup rotation in place (which is composed of all four Department supervisors) in case there is an emergency and the Executive Director is unavailable to respond.  In these circumstances, the person in the Incident Command Backup rotation would temporarily fill in for the Executive Director.  Bruce was removed from the rotation in the summer of 2013, because the dispatch desk must be covered at

---

[11] Bruce attempts to controvert this fact by claiming that Zahner independently added her own substantive comments on the evaluations.  The cited deposition testimony, however, does not establish that.  Rather, it establishes that Zahner "had no knowledge of the dispatcher's performance and often just typed what it said."  Although Bruce claimed Zahner went back and added "her interpretation or narrative," he has not been able to identify a single instance of substantive comments made by Zahner.  Furthermore, Bruce signed the evaluations as the evaluator, and he testified that there was nothing "inaccurate or false" in the evaluations.  Doc. 28-1, pp. 205–07.

all times, especially during an emergency.  Thus, according to Moses, it would not be efficient to have Bruce on the Incident Command Backup rotation because there were not many individuals, other than the dispatchers, who could cover the dispatch desk.[12]  Moses placed Bruce back on the rotation in 2016 after the Department trained enough people to cover the dispatch desk during emergencies.

c.    Zahner assisted Bruce with revising the written protocols for dispatch

Shortly after she came on the job, Moses discovered that dispatch did not have a complete set of written "protocols" for dispatchers to follow to ensure consistency.  Moses decided that the written protocols would need to be revised and new protocols would need to be added.  She went to Bruce first and asked him to be in charge of the revisions.  After delay, Bruce submitted a single draft protocol to Moses that she believed had several problems.[13]  Bruce did not provide any other protocols to Moses.  In the hope of speeding up the process, Moses then asked Zahner to work with Bruce, the other dispatchers, as well as the security officers, to prepare the written protocols.  In carrying out this assignment, Zahner did not provide substantive information herself.  Rather, she relied on information furnished by Bruce, the dispatchers under his supervision, and the security officers, and then reduced the information in writing in the form of written protocols.

---

[12] According to Bruce, however, this was effectively a reassignment of some of his leadership responsibilities.

[13] Bruce attempts to partially controvert this fact, responding that Bruce "was supposed to deliver his proposed changes to Zahner before providing them to Moses."  Doc. 28, p. 4.  However, the cited testimony only establishes that he was "supposed to" deliver the protocols to Zahner first; it does not establish that Bruce actually delivered them to Zahner before Moses.  *See* Doc. 28-1, p. 189–92.  The parties have not cited any evidence where Bruce actually went to Zahner with a question or problem before going to Moses.  In fact, Bruce testified that he has never been unable to speak to Moses first.  Doc. 28-1, p. 191.

-10-

      d.     Executive Director Moses included Zahner in emails to dispatch

Bruce testified that Moses would sometimes include Zahner in emails that only involved the dispatch office. He also stated in an affidavit that Zahner "routinely sent emails to my staff without first going through me . . . ."[14] While the District did not controvert Bruce's statements, the parties provided just one email chain to the Court. On June 18, 2014, nearly a year after Bruce claims he was placed "under" Zahner, Bruce sent an email chastising Moses for sending an email to the dispatchers.[15]

      e.     Zahner redecorated the dispatch office

According to Bruce, Zahner "decorated" and "redecorated" the dispatch office space; decisions that he was not "involved in."[16] When asked what decisions Zahner made for the dispatch office, Bruce testified:

> Michele [Zahner] just bought stuff and come in there and—well, I don't know if we—we had the place remodeled, but she bought the decorations and stuff and just decorated, which is appreciated, but it—I mean, I wasn't going to say, no, I don't want that done. I'm a team player, so I—you know, team effort. She did a good job, don't get me wrong.[17]

---

[14] Doc. 28-1, p. 4.

[15] Bruce wrote: "Seems to me you would ask *the Supervisor* about *their department*. All you did by asking about arming systems is show that you don't want to consult with me on *my department*." Doc. 32-6, p. 1 (emphasis added). As the District points out, Bruce specifically referenced himself as a "supervisor" and characterized dispatch as *his* department in this email.

[16] Doc. 28-1, Ex. 2, pp. 140, 143.

[17] Doc. 28-1, Ex. 2, p. 143. Zahner stated in an affidavit that she never redecorated the dispatch area, with or without Bruce's input. At one point, however, she offhandedly suggested to Bruce that it might be helpful to consider hanging a bulletin board and a dry erase calendar in the dispatch area during a meeting with Moses and Bruce. Doc. 32-2, p. 1.

Although Bruce claims that the dispatch office space was an area under his control, there has been no evidence presented to the Court that would suggest that Bruce is (or was) responsible for decorating the dispatch office space.

    f.  Zahner's involvement in meetings over dispatch

   Bruce claims that Zahner "presented at and led multiple meetings of the dispatchers, and she corresponded to the dispatch staff directly and without [his] approval."[18]  The deposition testimony Bruce cites in support of this claim,[19] begins with counsel's question to Bruce regarding Zahner presenting at and being allowed to "run the dispatchers' meetings."  Bruce was asked "what date or dates did Michele Zahner, quote 'run a dispatchers' meeting?' "  Bruce could not recall a date, but answered that it happened "more than once."  He complained that "it confuses the employees of . . . who their direct line supervisor is" when they see him as "one of the crowd participating in the same training," and that his authority as a supervisor was undercut when Zahner led the training instead of him.  He replied affirmatively when asked "isn't it true that what she talked about was technology?"  He further testified that he presented at some of these meetings as well, but could not estimate a percentage.

   The details of the unknown number of meetings led by Zahner are vague, but Bruce acknowledged that Zahner talked about technology,[20] and that he presented at some of these meetings as well.  Bruce indicated during his deposition that these were quarterly meetings.

---

[18] Doc. 28, p. 4.

[19] Doc. 28-1, pp. 304–08.

[20] As explained in the following sub-section, the "technology" Zahner was talking about was likely a new surveillance system that was being installed.  The entire Safety Services Department, including the dispatchers, had to learn how to use the new system, and Zahner was the person who helped train the entire Department.  *See infra* n. 23.

The record before the Court contains substantive details of only a single meeting (although it is not clear if this meeting was one of the dispatch meetings Bruce complains about). In May of 2015, the Safety Services Department held its annual "End of Year Meeting/Safety Services Training." The purpose of the 2015 meeting was, in large part, to foster team building within the Department. Both Zahner and Quick approached Moses before the meeting and volunteered to assist with the planning, preparation, and presentation of materials at the meeting. Bruce never volunteered to assist in any way with the meeting. According to the District, had he done so, he would have been allowed to present materials to the Department as Zahner and Quick had done.

g.     Bruce was not involved in implementing the new surveillance system

In May 2013, USD 259 purchased a centralized IP video surveillance system from Aventura Technologies, Inc. for approximately $3 million. Although surveillance and alarms are obviously a matter of concern to the Safety Services Department, the Aventura system is administered by USD 259's Information Services and Technology Department.[21] The implementation of the new system affected the entire Safety Services Department, not just dispatch.[22] As a result, it was incumbent on the entire department to learn the system. To do so, Zahner, on her own initiative, trained herself and then helped train others in the Safety Services Department, including the dispatchers, how to use the system.[23]

---

[21] The previous system that was being replaced was administered by USD 259's Facilities Department.

[22] Additionally, there is no evidence that dispatch was affected any more than the rest of the Safety Services Department.

[23] Bruce did not attempt to controvert these facts. Because Zahner helped train others in the Department, including the dispatchers, it seems likely that the "technology" Zahner was talking about in the meetings/training sessions she led was the new Aventura system.

There is some confusion regarding Zahner's and Bruce's respective roles in implementing the new system.  In her affidavit, Moses stated: "I never assigned Zahner the task of implementing the Aventura surveillance system, and I never removed this task from Bruce's job duties.  In his response, Bruce stated that it was uncontroverted that "Zahner was not made the contact person with respect to the implementation of the Aventura surveillance system."[24]   However, in attempting to controvert a completely unrelated statement of fact, Bruce claimed that "Zahner *was* appointed to be the contact person when dealing with Aventura . . . instead of [Bruce]."[25]   In support, Bruce cites to his deposition testimony, where he testified that he knows Zahner "was given Aventura," as she was "the person for safety services . . . that contacted and worked with Aventura."[26]  While Bruce has controverted whether Zahner was appointed to be the contact person when dealing with Aventura, it is uncontroverted that the task was never removed from Bruce's job duties, because it was not one of his job duties to begin with.

> h.    Bruce was required to "work ballgames"

Finally, although Bruce's claims primarily focus on Zahner taking control of his responsibilities, Bruce contends in the pretrial order that USD 259 retaliated against him by increasing his workload.[27]   During his deposition, Bruce was asked what evidence he had that his

---

[24] *See* Doc. 25, p. 6 ¶ 21 ("Zahner was not made the contact person with respect to the implementation of the Aventura surveillance system."); Doc. 28, p. 6 ¶ 21 ("Uncontroverted.").

[25] Doc. 28, p. 4.

[26] Doc. 28-1, Ex. 2, pp. 97–98.  Moses, in her affidavit, submits that she never assigned Zahner the task of implementing the Aventura surveillance system or removed this task from Bruce's job duties.  And Zahner, in her affidavit, submits that she was not made the contact person with respect to the implementation of the Aventura video surveillance system.  According to Moses, Zahner, on her own initiative, sought to learn about the new system and teach the rest of the Department how to use it.

[27] Doc. 23, p. 4.  Bruce appears to have abandoned this argument because he does not contend that this qualified as an adverse employment action in his response to USD 259's motion for summary judgment.

workload increased as a result of his FMLA leave request. He answered, simply: "Working ballgames." This appears to be the only evidence pertaining to whether his workload was increased.

### 5.    *Additional allegations of discrimination or retaliation*

At no point during his employment by USD 259 have Bruce's salary or benefits been reduced. However, Bruce claims that after his FMLA leave request, he started noticing that his work was being scrutinized more closely than similarly-situated white colleagues and female colleagues. During his deposition, however, Bruce was unable to recall "any evidence" that his actions were more closely monitored than others.[28] The only evidence Bruce submitted is a statement Bruce made in an affidavit after USD 259 filed the present motion for summary judgment. In the affidavit, Bruce states that after Moses became Executive Director, "I started noticing my work was being scrutinized more closely than similarly-situated white colleagues and female colleagues."[29]

Bruce also claims that after his FMLA leave request, he was denied training opportunities. The uncontroverted evidence shows that Moses has only denied one training request sent to her by Bruce. The request was made in 2015, and it was denied because of the high cost of the eight-week training program (approximately $10,000) and the budget constraints placed on the Department. Bruce's only attempt to controvert this is his own affidavit, in which he states that

---

[28] Doc. 28-1, Ex. 2, p 268. In his response, Bruce attempts to controvert this statement. He cites to an affidavit created after the motion for summary judgment was filed. It provides: Even before my demotion, I received unequal treatment from Terri Moses. She told me to craft and adhere to written protocols for my department while also following the protocols of the Facilities Division, which is something that is not required of security officers who operate under the supervision of Chuck Newman. It is not clear how this is relevant, and it certainly does not controvert his deposition testimony, where he was unable to recall any evidence that his actions were more closely monitored than others.

[29] Doc. 28-1, pp. 2–3.

his "training session was less expensive than other training sessions for other employees, such as Stephanie Quick and Michele Zahner."[30]  Moses' affidavit, however, states that neither Zahner nor Quick have attended any trainings that were more expensive than the $10,000 training that Bruce requested to attend.[31]

Bruce claims that Executive Director McKenna disciplined him once for "giving overtime," stating that Bruce should have come in and worked it.  Yet, according to Bruce, "Michele [Zahner] or Stephanie [Quick] would not have been expected to work to cover an [sic] shift in dispatch, even though they are supervisors."[32]

Bruce claims that three dispatchers who work under Bruce told Bruce that Moses was "insistent on saying something negative" about Bruce, "looking for something negative" about Bruce, and "felt uncomfortable" with Moses's line of questioning.[33]  Bruce finally claims that he has witnessed Moses display a racial bias against black people while serving at USD 259.  First, Moses made a racially insensitive joke in his presence that offended him where Moses referred to three new potential employees whose names began with the letter "K," and Moses referred to them as the "KKK."  Second, Moses has asked Bruce to lower Laurie Anderson's performance evaluation, and Moses said that she would not allow Laurie Anderson's pay to be increased.  And around the same time, Moses also made a comment that Laurie Anderson has an African-American son-in-law.  However, USD 259 disputes whether any of these events actually occurred.

---

[30] Doc. 28-1, p. 5.

[31] Doc. 32-3, p. 2.

[32] Doc. 28-1, p. 97.

[33] Doc. 28-1, p. 99.  This is controverted.  Moses's affidavit states that she approached those three dispatchers and sought feedback, positive or negative, from them regarding supervision as part of her normal practice in seeking to make the department function more efficiently.

## C.    Procedural History

Bruce filed a Kansas Human Rights Commission ("KHRC") Complaint against USD 259 on November 8, 2013, asserting discrimination, which was assigned Case No. 36859-14.  Bruce filed a separate KHRC Complaint against USD 259 on May 11, 2015, asserting retaliation, which was assigned Case No. 37957-15.  In November of 2015, the KHRC issued its determination of "No Probable Cause" with respect to both Complaints.

Bruce requested that the Equal Employment Opportunity Commission ("EEOC") review the KHRC's decisions.  The EEOC assigned Charge Nos. 28D-2015-00470 and 28D-2014-00091. He received his Dismissal and Notice of Rights letters from the EEOC for both charges in February of 2016.

The parties do not contest that Bruce has exhausted his administrative remedies.

## II.    Legal Standard

Summary judgment is proper if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.[34]  A fact is "material" when it is essential to the claim, and issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor.[35]  The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim.[36]  If the movant carries its initial burden, the nonmovant may not simply rest on its pleading, but must instead "set forth specific facts" that would be admissible in evidence in the event of trial

---

[34] Fed. R. Civ. P. 56(a).

[35] *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006).

[36] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citation omitted).

-17-

from which a rational trier of fact could find for the nonmovant.[37]  These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits—conclusory allegations alone cannot survive a motion for summary judgment.[38]  The Court views all evidence and reasonable inferences in the light most favorable to the non-moving party.[39]

### III.    Discussion

In this action, Bruce asserts claims of sex and race discrimination under Title VII, associational discrimination in violation of the ADA, and retaliation.  Under Title VII, it is unlawful "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."[40]  Title I of the ADA prohibits "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association."[41]  "This prohibition is known as the 'association provision' of the ADA."[42]  Both Acts contain anti-retaliation provisions.[43]

---

[37] *Id.* (citing Fed. R. Civ. P. 56(e)).

[38] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197 (10th Cir. 2000) (citation omitted).

[39] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

[40] 42 U.S.C. § 2000e-2(a)(1).

[41] 42 U.S.C. § 12112(b)(4).

[42] *Trujillo v. PacifiCorp*, 524 F.3d 1149, 1154 (10th Cir. 2008) (citing *Den Hartog v. Wasatch Aca.*, 129 F.3d 1076, 1082 (10th Cir. 1997)).

[43] *See Hennagir v. Utah Dep't of Corrs.*, 587 F.3d 1255, 1266 (10th Cir. 2009) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67–68 (2006)).

USD 259 moves for summary judgment, arguing that the material facts do not establish a prima facie case of employment discrimination or retaliation.  And, even if Bruce could establish a prima facie case, USD 259 argues that it is entitled to judgment as a matter of law because it had legitimate non-discriminatory and non-retaliatory reasons for every action it has taken in relation to Bruce.  Finally, USD 259 also argues that there is no evidence that the District's explanation for any challenged action is pretextual.  The Court will first address Bruce's sex, race, and associational discrimination claims, and then address Bruce's retaliation claim.

## A.    Prima Facie Case

All of Bruce's claims are subject to the three-step burden-shifting framework of *McDonnell Douglas Corporation v. Green*.[44]  Step one requires Bruce to prove a prima facie case of discrimination or retaliation.[45]  If Bruce establishes a prima facie case, then the USD 259 must provide legitimate, non-discriminatory reasons for its actions.[46]  Then, if the District satisfies its burden, the burden shifts back to Bruce to establish that the District's reasons were merely a pretext for discrimination or retaliation.[47]

### 1.    Elements of a Prima Facie Case for Discrimination Claims

To prove a prima facie case of discrimination under Title VII, Bruce must establish that:

---

[44] 411 U.S. 792 (1973).  *See Hare v. Donahoe*, 608 F. App'x 627, 630 (10th Cir. 2015); *Trujillo*, 524 F.3d at 1154.

[45] *Hare*, 608 F. App'x at 630.

[46] *Adamson v. Multi Community Diversified Servs, Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008).

[47] *Id.*

(1) he is a member of a protected class; (2) he suffered an adverse employment action; and (3) the action took place in circumstances which would give rise to an inference of discrimination.[48]

To prove a prima facie case of associational discrimination, Bruce must establish that: (1) he was "qualified" for the job at the time of the adverse employment action; (2) he was subjected to an adverse employment action; (3) he was known by his employer at the time to have a relative or associate with a disability; and (4) the adverse action occurred under circumstances raising a reasonable inference that the disability of the relative or associate was a determining factor in the employer's decision.[49]

### 2. Elements of a Prima Facie Case for a Retaliation Claim

To prove a prima facie case of retaliation, Bruce must show that: (1) he engaged in protected opposition to discrimination; (2) a reasonable employee would have found the challenged action materially adverse; and (3) a causal connection existed between the protected activity and the materially adverse action.[50]

### B.    Discrimination Claims: Bruce was not subjected to an adverse employment action

USD 259 first argues that Bruce cannot establish a prima facie case of race, sex, or associational discrimination because he was not subjected to an adverse employment action. Each of Bruce's discrimination claims requires a showing of an adverse employment action. For discrimination claims, "[a]n adverse employment action is a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different

---

[48] *Furr v. Ridgewood Surgery & Endoscopy Ctr., LLC*, 192 F. Supp. 3d 1230, 1246 (D. Kan. 2016).

[49] *Id.* at 1154.

[50] *Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1208 (10th Cir. 2007).

responsibilities, or a decision causing a significant change in benefits."[51]  "[N]ot every perceived indignity will rise to the level of an adverse employment action."[52] And "a mere inconvenience or an alteration of job responsibilities" does not qualify as an adverse action.[53]

Bruce has identified three actions taken by USD 259 that he contends qualify as adverse employment actions: (1) he was reassigned to the second shift shortly after requesting FMLA leave; (2) he was denied a training course opportunity in 2015; and (3) he was functionally demoted, which resulted in a reassignment of responsibilities where he suffered a dramatic loss of duties within the Safety Services Department.

### 1.    *Reassignment to the second shift was not an adverse action*

Bruce's reassignment to the second shift for five days or less does not constitute an adverse employment action.  "[R]eassignment of job duties is not automatically actionable."[54]  An adverse employment action is a "*significant* change in employment status, such as . . . reassignment with *significantly* different responsibilities . . . ."[55]

Here, there is no evidence that his reassignment to the second shift even slightly changed his employment status or responsibilities.  In fact, Bruce did not even attempt to controvert that he "performed the same tasks and had the same job responsibilities on second shift as he did on first shift."[56] The most favorable evidence for Bruce is his own testimony that Executive Director

---

[51] *Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 635 (10th Cir. 2012) (emphasis and quotations omitted).

[52] *EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1041 (10th Cir. 2011) (quoting *Haynes*, 456 F.3d at 1222).

[53] *Piercy v. Maketa*, 480 F.3d 1192, 1203 (10th Cir. 2007) (quotations omitted).

[54] *White*, 548 U.S. at 71.

[55] *Piercy*, 480 F.3d at 1203 (emphasis added).

[56] *See* Doc. 25, p. 7; Doc. 28, p. 8.

McKenna "initially resisted his request for leave pursuant to the FMLA," told Bruce that "she could not accommodate his leave request," and then placed Bruce on the second shift instead of his normal first shift for a week.[57] But an adverse employment action must have more than simple reassignment—the reassignment must result in significantly different responsibilities.

The Court acknowledges that "many employees would find working the day shift preferable to the night shift."[58] "But this does not establish an assignment to the night shift is sufficiently material to constitute a *significant* change in employment status or responsibilities."[59] Bruce's reassignment to second shift for just five days, while his responsibilities remained the same, does not rise to the level of an adverse employment action.[60]

    2.    *Denial of training request was not an adverse action*

The District's denial of Bruce's request to attend an eight-week training course in 2015 does not constitute an adverse employment action either. Viewing the evidence in the light most favorable to Bruce, he requested to attend a course, but was denied by Moses. Moses told him that his request was denied because of the high cost. But the training he requested to attend "was less

---

[57] Doc. 28, p. 7.

[58] *Daniels*, 701 F.3d at 635.

[59] *Id.* (emphasis in original). In *Daniels*, the Tenth Circuit held that the simple transfer from day shift to night shift was not an adverse employment action even though she had informed her managers that she disliked working the night shift. Here, there is no evidence—controverted or otherwise—that the second shift was less prestigious, had worse working conditions, provided less advancement opportunities, or was less desirable for any other reason. In fact, there is no evidence that Bruce did not even want to work the second shift.

[60] *See id.*; *McGowan v. City of Eufala*, 472 F.3d 736, 742–43 (10th Cir. 2006) (concluding that denial of employee's request to transfer to the day shift was not a materially adverse employment action because the shifts "offered no differences in pay and benefits, nor was the night shift more arduous," and found that employee desired the transfer "purely for personal reasons").

expensive than other training sessions for other employees, such as Zahner and Quick, and Newman has had to travel for several training sessions since his arrival."[61]

The denial of training, by itself, does not constitute an adverse employment action. To constitute an adverse action, an employee must show they were denied training *and* the lack of training negatively affected the employee's advancement opportunities or otherwise injured the plaintiff.[62] Thus, it is irrelevant whether the training Bruce requested was less expensive than training sessions approved for other employees. To establish the denial as an adverse employment action, Bruce needs to point to evidence that his employment status, responsibilities, or job prospects were affected by the District's decision to deny Bruce the opportunity to attend the course. Bruce has not even presented evidence that the training course was relevant to his job, let alone that it has had any negative affect on his status. On the contrary, Bruce admits that he has attended "numerous continuing education training sessions to keep up to date with his job responsibilities."[63]

Because there is no evidence to suggest Bruce was even slightly affected, the denial of Bruce's training request does not constitute an adverse employment action.[64]

---

[61] Doc. 28, p. 12.

[62] *Rogers v. Apria Healthcare, Inc.*, 2013 WL 3773838, at *5 (D. Kan. 2013) (citations omitted). *Compare Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1219 (10th Cir. 2013) (opining that denial of training presumably would constitute an adverse employment action where lack of training undisputedly blocked plaintiff from applying for promotions, but summary judgment was nonetheless affirmed for failure to establish pretext) *with Tran v. Trs. of State Colls. in Colo.*, 355 F.3d 1263, 1268 (10th Cir. 2004) (concluding that employer's delay in providing plaintiff with additional training not an adverse employment action because delay did not "create an adverse change in her job responsibilities").

[63] Doc. 28, pp. 12–13.

[64] *See Piercy*, 480 F.3d at 1203.

3.      *Bruce was not functionally demoted*

Finally, Bruce's allegation that he was "functionally demoted" is not supported by the record, and Bruce cannot show that he was subjected to an adverse employment action. To be clear, Bruce was not officially demoted. At no point during his employment by USD 259 have Bruce's salary or benefits been reduced. Rather, Bruce argues that he experienced a "functional demotion," which "resulted in a reassignment of responsibilities where [he] suffered a dramatic loss of duties within the Safety Services Department, which occurred shortly after" making his FMLA leave request in November of 2012.[65] Although the Tenth Circuit does not deem "a mere inconvenience or an alteration of job responsibilities to be an adverse employment action, the prong is satisfied by a significant change in employment status, such as . . . reassignment with significantly different responsibilities."[66]

Even viewing the evidence in the light most favorable to Bruce, he did not experience a "*significant* change in employment status," or "*significantly* different responsibilities."[67] At best, Bruce suffered a few mere inconveniences or alterations of his job responsibilities from early 2013 through August of 2016.

To begin, Bruce cannot establish that he was reassigned or demoted. The Court will assume that Bruce's title was changed from "Department Supervisor" in 2011 to "Security Communications Supervisor," and then to "Lead Dispatcher" at some point. However, the simple

---

[65] Doc. 28, p. 24.

[66] *Jones v. Okla. City Pub. Schs.*, 617 F.3d 1273, 1279 (10th Cir. 2010) (internal quotations and citations omitted).

[67] *Id.* (emphasis added).

-24-

fact that Bruce was assigned a less-prestigious title does not, by itself, constitute an adverse employment action.[68]

Notwithstanding the title change, there is no evidence that Bruce was demoted, that Zahner was promoted to be Bruce's supervisor, or that the dispatchers under Bruce's supervision were assigned to a different supervisor.  One time, in 2013, Moses showed Bruce a *draft* organizational chart in which Bruce would have reported directly to Zahner, but Bruce expressed his disdain for that change, and that draft was scrapped and the proposed change was never incorporated.  Bruce's job description has never required him to report to anyone other than Moses, and Bruce admits that Moses was (and is) his boss.  Furthermore, Bruce was never required to report to Zahner, at no point did Zahner (or anyone other than the Executive Director) issue an order to Bruce, and the dispatchers under Bruce's supervision never reported to anyone other than Bruce.

Even if there was evidence that Bruce had been reassigned, he would need to show that his reassignment was accompanied by significantly different responsibilities to be an adverse employment action.  But Bruce has not done so.  Despite Bruce's allegations that he was retaliated against over a period of more than three years, his responsibilities were almost entirely unaffected.

As a supervisor, Bruce's overall responsibility was to "[supervise] dispatch personnel and all functions of Security Communications."  His job description provided:

**Essential Performance Responsibilities:**
- Schedules assignments for all dispatchers
- Monitors the activities of all Security communications personnel on day, night, weekend, and holiday assignments
- Monitors district radio traffic and Security Communications telephone calls

---

[68] *See Wells v. Colo. Dep't of Transp.*, 325 F.3d 1205, 1213–14 (10th Cir. 2003) (concluding that the plaintiff's first job transfer, from a position as a "project engineer," to a position as an "assistant project engineer," was not an adverse employment action because her work and responsibilities were similar in both positions); *Grayson v. City of Chicago*, 317 F.3d 745, 750 (7th Cir. 2003) (holding that change in title from Foreman to Sub-foreman, with no change in responsibilities, salary and benefits, is not an adverse employment action).

- Conducts and supervises routine and emergency electronic building checks
- Monitors alarms and troubleshoots for all USD 259 facilities, notifies appropriate personnel
- Monitors and/or prepares and delivers a daily report of noteworthy Security Communications issues
- Facilitates training for Security Communications personnel
- Assumes primary responsibility for personnel assignments in emergency situations and/or approved leave requests
- Assists with routine and emergency situations pertaining to USD 259 properties, personnel, and students as requested to do so
- Develops policies and procedures regarding area of responsibility
- Interviews prospective employees
- Monitors and reports activities of Kansas One-Call
- Manages Security Communications expenses and makes recommendations regarding the Safety Services Budget
- Provides supervisory duties (i.e. mentoring, coaching, evaluation)
- Participates as a member of the District Crisis Team

Additionally, Bruce's job description also includes a clause that said he would be required to "[perform] other duties as assigned."

Bruce does not contest that the vast majority of his responsibilities were unaffected during the period at issue from early-2013 through August 2016. Additionally, two of Bruce's responsibilities have been identified as important or essential: supervising the dispatch personnel and ensuring that the dispatch desk is staffed. Bruce does not allege that these responsibilities were ever taken away from him. Still, he points to a handful of incidents to argue that his responsibilities were reassigned to Zahner. As demonstrated below, the evidence shows only one instance where one of Bruce's responsibilities was taken away from him. The rest of Bruce's allegations are unsupported by the evidence, or unrelated to his employment duties or responsibilities.

a.      Removal from the backup rotation was not an adverse employment action

Bruce's only credible argument is that he was removed from the Incident Command Backup rotation shortly after requesting FMLA leave.  The Safety Services Department has an Incident Command Backup rotation in place (which is composed of Department supervisors) in case there is an emergency and the Executive Director is unavailable to respond.  In these circumstances, the person in the Incident Command Backup rotation would temporarily fill in for the Executive Director.  Bruce was removed from the rotation in the summer of 2013 and was not placed back on the rotation until sometime in 2016.

However, serving in the rotation is not in Bruce's job description, so it only became his responsibility because of the clause stating that he was to "[perform] other duties as assigned." "But there is no inconsistency with the job description that some duties, once assigned, should later be unassigned as necessary."[69]  Thus, Bruce cannot establish that his removal from the rotation "constitute[d] a significant change in employment status."[70]

b.      Bruce's responsibilities were not reassigned to Zahner

Bruce's job description indicates that he is responsible for facilitating training, and he is responsible for leading office meetings at least occasionally.  But on two or more occasions,

---

[69] *See Nettle v. Cent. Okla. Am. Indian Health Council, Inc.*, 334 F. App'x 914, 926–27 (10th Cir. 2009) (concluding that employee, who had a clause to "perform other duties *as assigned*" in her job description, had not been subjected to an adverse employment action when some of her assigned duties were later unassigned) (alterations omitted).

[70] *Stinnett v. Safeway, Inc.*, 337 F.3d 1213, 1217 (10th Cir. 2003).  To the extent that this could constitute an adverse employment action, Bruce would not be able to show that his removal was pretextual.  Bruce was initially removed from the rotation because the dispatch desk must be covered at all times, especially during an emergency. Thus, according to Moses, it would not be efficient to have Bruce on the Incident Command Backup rotation because there were not many individuals, other than the dispatchers, who could cover the dispatch desk.  Moses placed Bruce back on the rotation in 2016 after the Department trained enough people to cover the dispatch desk during emergencies. Bruce has not identified any evidence that a factfinder could conclude that the explanation USD 259 has given for removing Bruce from the backup rotation was pretextual.

Zahner held a meeting and/or training for the dispatchers.  Although the details are almost nonexistent, Zahner "presented at" and was allowed to "run" two or more quarterly "meetings," (which Bruce also referred to as "training") on unknown dates in which Zahner talked about technology.[71]  Bruce mostly sat in the crowd while Zahner presented.  However, Bruce did present information during at least one of these meetings.[72]  And there is no evidence that Bruce was responsible for leading these meetings and/or training sessions.  Rather, the uncontroverted evidence shows that supervisors would volunteer to present materials at meetings, and Bruce would have been allowed to present materials to the Department if he had volunteered.[73]  No reasonable factfinder could conclude that this amounted to a substantial change in his employment status.

Next, Bruce claims that his responsibility to develop policies and procedures for dispatch was reassigned to Zahner, but the evidence shows that Zahner merely assisted Bruce without providing substantive input.  It is uncontroverted that Moses went to Bruce first and asked him to take charge of revising the written "protocols" for dispatchers to follow.  After delay, Bruce submitted a single draft protocol to Moses that she believed had several problems.  In the hope of speeding up the process, Moses then asked Zahner to work with Bruce.  In carrying out this

---

[71] It seems very likely that Zahner was training Bruce and the dispatchers under his supervision on the new Aventura surveillance system during these meetings/training sessions.  Because this new system affected the entire Department, every employee needed to learn about it.  *See supra* n. 23.  As explained below, it was not one of Bruce's responsibilities to train anyone on the new system, and in all likelihood Zahner was not infringing upon any of Bruce's responsibilities.

[72] Again, the details of these meetings are incredibly vague.  However, it is uncontroverted that Zahner, on her own initiative, trained herself and then helped train others in the Safety Services Department, including the dispatchers, on how to use the new surveillance system.  Because Bruce referred to these "meetings" as "training" that he participated in, it seems likely that these meetings were training sessions in which Zahner taught other Safety Services Department employees about the new surveillance system..

[73] Doc. 25-3, p. 4.

assignment, Zahner did not provide substantive information herself. Rather, she relied on information furnished by Bruce, the dispatchers under his supervision, and the security officers, and then reduced the information in writing in the form of written protocols. Although Zahner assisted, Bruce was ultimately responsible for revising the protocols for his office. Zahner merely served as a typist. Thus, Bruce's responsibility to develop policies for Dispatch was not reassigned to Zahner.

Similarly, the evidence shows that Zahner assisted Bruce in evaluating the dispatchers under his supervision, but it does not show that Bruce's responsibility to perform employee evaluations was reassigned. As a supervisor, Bruce was expected to conduct employee evaluations of the dispatchers under his supervision. It is uncontroverted that Zahner *participated* in the 2013–14 evaluations. However, she did not do so in a supervisory capacity. According to Bruce, Zahner "often just typed what [he] said" because Zahner was a better typist. Although Zahner occasionally "went back and added her interpretation or narrative," Bruce signed each evaluation on the line indicating "Evaluator's Signature," while Zahner signed in the space below. Indeed, Bruce stated that "Michele [Zahner] could not have done the evaluation accurately by herself," because she "had no knowledge of the dispatcher's performance." Thus, Zahner's participation cannot be viewed as evidence of Bruce's supervisory duties being reassigned.[74]

The remainder of Bruce's complaints are unrelated to his employment duties or responsibilities. Bruce complains that Zahner "routinely sent emails to [Bruce's] staff without first going through" him, and that Zahner decorated the dispatch office space without asking him

---

[74] In fact, Bruce spoke to Zahner in May of 2017 and told her that he "really appreciated her help in preparing" the performance evaluations. Doc. 25-4, pp. 200–01.

for permission to do so.  While such occurrences may have been annoying, they do not amount to an adverse employment action.[75]  There is simply no evidence to suggest that Zahner was infringing upon Bruce's responsibilities in these instances.

And finally, Bruce complains that Zahner was appointed to be the contact person when dealing with the new Aventura surveillance system, instead of him.[76]  Again, Bruce's job description included a clause that said he would be required to perform "other duties as assigned," but he has presented no evidence to infer this responsibility should have fell to him.[77]

In sum, the record does not support Bruce's claims that he was "functionally demoted" and that "a significant amount of [his] management responsibilities were reassigned to Zahner."  Many of the acts Bruce complains of "at worst, are indicative of common workplace drama."[78]  At best, Zahner was allowed to lead a few meetings/training sessions for Bruce and the dispatchers, and Bruce was removed from a backup rotation used in emergency situations.  But there is no evidence

---

[75] *See Pioneer Centres Holding Co. Emp. Stock Ownership Plan & Tr. v. Alerus Fin., N.A.*, 858 F.3d 1324, 1334 (10th Cir. 2017) (holding that an inference is unreasonable if it is a mere possibility or involves a degree of speculation and conjecture that requires the factfinder to make a guess); *cf. Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1178–79 (10th Cir. 1999).

[76] Bruce has since "expressed concerns about the new Aventura alarm system and asked why he was not involved in the decision making process in implementing the new system."  Doc. 28, p. 13.  He provides no evidence that the Supervisor of Dispatch's responsibilities include implementing surveillance or alarm systems.  However, it is uncontroverted that Zahner had no prior experience with implementing security systems, and "the fire system" that Bruce and Gary Welch "set up worked properly."  Doc. 28, p. 13.

[77] It is uncontroverted that, at some point in Bruce's employment, Bruce and Gary Welch set up a "fire system" that "worked properly."  Doc. 28, p. 13.  There is no evidence, however, that this experience qualified Bruce to implement a multi-million dollar surveillance system.
      To the extent Bruce argues that this new responsibility should have been assigned to him, he has failed to identify facts supporting a finding that the failure to do so constitutes an adverse employment action.  He identifies no opportunities denied as a result of the assignment, does not allege Zahner received additional compensation due to this assignment, and does not claim that the assignment negatively affected his employment status or terms and conditions of his employment.  Bruce has failed to present facts sufficient to support a conclusion that the assignment constitutes an adverse employment action.  *See Nettle*, 334 F. App'x at 926–27.

[78] *Hook v. Regents of Univ. of Cal.*, 394 F. App'x 522, 535 (10th Cir. 2010) (citing *White*, 548 U.S. at 68).

that leading the meetings or being in the backup rotation were particularly important, time-consuming, or otherwise reached "the core of the description of [his] position"—to supervise dispatch personnel.[79]  Indeed, Bruce admits that he never complained to Zahner or Moses about these changes, because he "had to do [his] supervisor role."[80]

On the other hand, the record shows that the dispatchers have always reported directly to Bruce, and Bruce has always reported directly to the Executive Director.  At no point was Bruce actually subordinated to Zahner.  Furthermore, his salary and benefits have never been reduced. No reasonable factfinder could conclude that Bruce has suffered a significant change in his employment status.[81]

Thus, Bruce has not been subjected to an adverse employment action.  As this is an essential element for each of Bruce's discrimination claims (sex and race discrimination under Title VII, and associational discrimination in violation of the ADA), USD 259 is entitled to judgment as a matter of law.  The Court does not need reach the other steps in the test for showing discrimination.

## C.   Retaliation Claim: Bruce Was Not Subjected to a Materially Adverse Action

Bruce has failed to satisfy the second and third elements of a prima facie case of retaliation—that a reasonable employee would have found the challenged action materially

---

[79] *See Nettle*, 334 F. App'x at 926–27 (reasoning that employee's job functions were not significantly altered when some of employee's responsibilities were taken away from the employee because those responsibilities did "not reach the core of the description of her position . . . .").

[80] Doc. 28-1, pp. 120.

[81] *See Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 532 (10th Cir. 1998) (concluding that employee did not suffer an adverse employment action because, although she was transferred, the new position involved "at most an insignificant alteration in job responsibilities").

adverse; and that a causal connection existed between the protected activity and the materially adverse action."[82]

Here, the first element is satisfied because Bruce's first complaint to the KHRC qualifies as protected opposition to discrimination. Bruce then argues that the second element is satisfied because, after filing his complaint, he "suffered a reassignment with significantly different responsibilities."[83] The "reassignment" Bruce complains of, was his "demotion" to Lead Dispatcher. Bruce filed this complaint to the KHRC on November 8, 2013. In the complaint he explained that "in July 2013, I was 'demoted' from the position of Safety Service Supervisor to Lead Dispatcher . . . ."[84] And most of Bruce's specific allegations concerning his responsibilities being reassigned happened prior to November 8, 2013 as well.[85] For example, Bruce was removed from the Incident Command Backup rotation "around the same time [he] communicated his FMLA request to McKenna,"[86] which in November of 2012. Bruce "cannot now credibly claim" that USD 259 engaged in this conduct—"which he acknowledges occurred before he filed any complaints or grievances—in retaliation for that activity."[87]

Regardless, to the extent that the District took any actions against Bruce after his complaint was filed, he cannot show "that a reasonable employee would have found the challenged action

---

[82] *See Proctor*, 502 F.3d at 1208.

[83] Doc. 28, p. 23.

[84] Doc. 25-16, p. 2.

[85] Indeed, Bruce argues that his "functional demotion resulted in a reassignment of responsibilities where [he] suffered a dramatic loss of duties within the Safety Services Department, which occurred shortly after requesting time off to care for his disabled mother pursuant to the FMLA." Doc. 28, p. 24. His FMLA request was made in November 2012, a year prior to the filing of his complaint with the KHRC.

[86] Doc. 28, p. 26.

[87] *See Turner v. Coupe*, 655 F. App'x 47, 50 (3d Cir. 2016).

materially adverse . . . ."[88]  In other words, Bruce must show that the action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."[89]  The action must be materially adverse "to separate significant from trivial harms," such as "petty slights, minor annoyances, and simple lack of good manners . . . ."[90]  And, for the reasons explained in the previous section, Bruce has suffered nothing more than "trivial harms."

Accordingly, Bruce is unable to establish the second and third elements necessary to prove a prima facie case of retaliation.  USD 259 is therefore entitled to judgment as a matter of law on Bruce's retaliation claim.

## IV.    Conclusion

The Court finds that no genuine disputes of material fact exist as to Bruce's four claims. Bruce is unable to establish a prima facie case of race, sex, or associational discrimination because he cannot show that he suffered an adverse employment action.  And he is unable to establish a prima facie case of retaliation because he cannot show that he suffered a materially adverse action or that any of USD 259's actions were causally related to the filing of his KHRC complaint.

**IT IS THEREFORE ORDERED** that Defendant USD 259's Motion for Summary Judgment (Doc. 24) is **GRANTED**.  The motion is granted with respect to all four of Plaintiffs' claims, and this case is closed.

---

[88] *White*, 548 U.S. at 68 (quotations omitted).

[89] *Id.*

[90] *Id.*

**IT IS FURTHER ORDERED** that USD 259's Unopposed Motion to Continue Trial Setting (Doc. 33) is **DENIED AS MOOT.**

**IT IS SO ORDERED.**

Dated this 1st day of June, 2018.

*Eric F. Melgren*

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE